## COLEMAN v. COMMISSIONER OF INTER-NAL REVENUE.

### No. 1255.

Circuit Court of Appeals, Tenth Circuit.

Jan. 21, 1936.

Robert C. Foulston, of Wichita, Kan. (George Siefkin and Lester L. Morris, both of Wichita, Kan., on the brief), for petitioner.

Arnold Raum, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Lucius A. Buck, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before LEWIS, PHILLIPS, and Mc-DERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

Coleman charged off $125,000 in his income tax return for 1930 as a loss resulting from an investment of that amount in the common stock of the Mountain Cross Granite Company. The Commissioner disallowed it and the Board of Tax Appeals affirmed on two grounds—one that Coleman's proof did not disclose that the stock became worthless during the taxable year, the other that there had been a reorganization as defined by section 112 (b) (3), (i) (1), Revenue Act of 1928, 45 Stat. 816, and hence no gain or loss was recognizable.

In 1927 and 1928 Coleman paid $125,-000 for 5,000 shares of the common stock of the company. The company owned large deposits of fine granite and a modern plant, but it was operating at a loss; an audit of February, 1930, disclosed it was out of funds and credit, had $36,000 current, and $120,000 bond, liabilities. Its balance sheet disclosed no value to the common stock. Coleman and other stockholders believed the company had possibilities if the storm could be weathered, but additional capital was needed immediately. Other efforts failing, one Walgren agreed to put $97,500 in cash into a new corporation which would take over the assets of the old and assume its liabilities.

The old company had five classes of securities outstanding: Bonds, preferred stock, prior preferred stock, Class "A" common stock, and common stock. Coleman owned some of all classes except the second; Walgren owned some of the third and fourth classes. The voting power was confined to the fifth class.

The new company had three classes of securities—bonds, preferred stock, and common stock. Voting power was in the common. Walgren's proposal was to take 13,000 shares of the new common at $7.50 a share and pay therefor $97,500 in cash. He also was to take 8,000 shares of com-

mon at $7.50 by surrendering 1,000 shares of prior preferred of the old company at $50 a share and 1,000 shares of Class A common at $10 a share. His proposal took care of the holders of securities of the old corporation by issuing to them common stock in the new company at $7.50 per share which could be paid for by surrendering securities of the old company on the basis of (a) par for bonds, (b) $50 per share for prior preferred, (c) $33.33 per share for preferred, and (d) $10 per share for Class A common—provided that one share of common stock of the old company must be surrendered for each share of common of the new company subscribed for. Common stockholders of the old company who did not surrender their stock according to this plan, were given the right to buy one share of the new company for $7.50 cash for each share of common owned in the old. Preferred stock in the new company was offered security holders of the old at $100 per share upon surrender of securities of the old at the same scale.

This plan was carried out. Walgren, with no voting power in the old company, had control of the new; other security holders of the old company had common or preferred, or both, of the new company. Walgren surrendered his senior securities and put in $97,500 in cash and got a majority of the voting stock of the new; the old security holders lost control, but did have common and preferred stock in a company with its current bills paid and some working capital.

■ 1. Whether the common stock became worthless in 1930 is a question of fact. The Commissioner found it did not, and the Board has affirmed. Does the proof, incontrovertibly show the contrary? We think not; further, we are in accord with the Board's conclusion. Doubtless if the company had liquidated in 1930 the common stock would have been wiped out. But it was not liquidated; and it was not liquidated because of the potential value in the "practically unlimited granite of fine quality available in various colors and a completed plant of modern type." Its difficulties arose from the depressed market and lack of working capital. The parties themselves bargained on the basis of a value in the common stock. Coleman has now 35,-050 shares of common and 1,551 shares of preferred of the new company, concededly of value; he acquired that by exchanging his securities in the old company, including

his common. An inseparable part of the trade was the surrender of the common stock. Even those common stockholders who owned no senior securities were given rights to purchase common of the new company at $7.50 a share, a right which the public did not have. When parties ascribe a value to stock by trading it in on stock of conceded value, it is substantial evidence that it had some value. In Kitrell v. United States (C.C.A.10) 79 F.(2d) 259, certiorari denied 56 S.Ct. 248, 80 L.Ed. ——, it appeared that stock of uncertain value was traded in at $25 a share for other stock; we held "The action of the parties was sufficient proof of value."

■ 2. We also approve the finding of the Commissioner and the Board that there was a reorganization in which neither gain nor loss can be recognized under the definition contained in section 112, Revenue Act 1928. The new company acquired all the properties of the old and assumed all its indebtedness; all the stockholders of the new corporation were stockholders in the old; new money went into the new corporation, but Coleman did not sell his stock, nor the transferor corporation its properties, for cash or short-term notes; instead the old stockholders received for their securities in the old corporation a substantial and definite interest in the new. The corporate set-up was altered, to be sure, and the proportionate interests of the owners were necessarily different because new money was supplied, as is the case whenever new capital comes into a corporation. But such circumstance is not inconsistent with reorganization.

Section 112 (b) (3), Revenue Act of 1928, provides:

"No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

Coleman exchanged his securities "solely for stock or securities" in the new company. Both companies were parties to the transaction. Was the transaction a "reorganization"? That term is defined in subdivision (i) (1) of the same section:

"The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least

a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)."

The new company acquired all the properties of the old. But one question remains, Did the transaction smack enough of a "merger or consolidation" that it can fairly be said to fall within the parenthetical phrase?

Recent decisions of the Supreme Court afford the answer. In Pinellas Ice Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 260, 77 L.Ed. 428, the court said:

"The words within the parentheses may not be disregarded. They expand the meaning of 'merger' or 'consolidation' so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation. But the mere purchase for money of the assets of one company by another is beyond the evident purpose of the provision, and has no real semblance to a merger or consolidation. Certainly, we think that to be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes."

Five cases decided by the Supreme Court of the United States on December 16, 1935, apply this rule to various corporate transactions. In Helvering v. Minnesota Tea Co., 56 S.Ct. 269, 273, 80 L.Ed. ——, it was held that the interest which the seller acquires in the affairs of the buyer must be "definite and material; it must represent a substantial part of the value of the thing transferred." But if it does, it is not material that "the relationship of the taxpayer to the assets conveyed was substantially changed"; nor that a large part of the consideration was cash "so long as the taxpayer received an interest in the affairs of the transferee which represented a material part of the value of the transferred assets." In Helvering v. Watts, 56 S.Ct. 275, 80 L.Ed. ——, stockholders exchanged all the stock of one corporation for stock and bonds in another. No taxable gain resulted to the individual stockholders, it was held, although it was conceded that an exchange of stock for bonds resulted "in a substantial change of position" for the

stockholders. In John A. Nelson Co. v. Helvering, 56 S.Ct. 273, 274, 80 L.Ed. ——, A corporation transferred the greater portion of its assets to B corporation to which passed control of A corporation, the consideration passing to A corporation consisting of nonvoting securities. It was held to be a reorganization, the court saying:

"The owner of preferred stock is not without substantial interest in the affairs of the issuing corporation, although denied voting rights. The statute does not require participation in the management of the purchaser; nor does it demand that the conveying corporation be dissolved. A controlling interest in the transferee corporation is not made a requisite by section 203 (h) (1) (A)."

The same rule was applied to other facts in G. & K. Mfg. Co. v. Helvering, 56 S. Ct. 276, 80 L.Ed. ——, and Bus & Transport Securities Corporation v. Helvering, 56 S.Ct. 277, 80 L.Ed. ——, decided the same day.

The facts in the case at bar bring it well within the rules thus laid down. The decision of the Board of Tax Appeals is, therefore, affirmed.